Welcome to the Fourth Circuit. We have four cases for argument this morning and we will begin with U.S. v. Wiley. Mr. Foster, whenever you're ready. Thank you, Your Honor. May it please the court, we represent Maurice Wiley, who was one of five defendants charged with conspiring to and attempting to rob a husband and I will be addressing the first two issues and Mr. Bryson will be addressing the second two issues, which are issues three and four. Certainly. Mr. Well, Joe, can you turn the volume up on the mic? Do I need to be louder? Yeah, maybe get a little closer to the mic. That's fine. Is this good? Okay, great. So in a nutshell, the defendants allegedly went to the house of the husband and wife that owned this Chinese restaurant with the intent to rob them of the money that they believe they brought home each night from their sales of food at the Chinese restaurant. Our client was apparently not the shooter, as the evidence showed, but was the driver. Another defendant in this case admitted eventually to shooting and killing the wife had gone to the front door to retrieve a pistol, which was her routine before the husband got out of the car with with a bag of money. Our client was the only one who went to trial. He was tried by himself. The three counts he faced were count one, conspiracy to commit a Hobbs Act robbery. Count two was an attempted Hobbs Act robbery, which was the same incident. Count three was conspiracy to possess firearms and furtherance of a crime of violence. So he was found guilty on all three counts and was sentenced to 240 months on count one, 240 months on count two, 80 months on count three for a combined sentence of 560 months. We contended at trial that count three, which alleged a conspiracy to possess firearms and furtherance of a crime of violence, failed to state an offense because it alleged that, and I'll read just a phrase of it, it alleged that they unlawfully and knowingly combined, conspired, and agreed with each other to possess firearms and furtherance of a crime of violence to wit an offense under subsection C of Title 18 U.S. Code 924. We submitted that 924C is not itself a crime of violence so that it did not allege an offense. But doesn't that, I mean, that indictment just simply indicates that the government had left itself the opportunity to plead and prove any crime of violence that fit under the statute. That's essentially what the indictment intended to do as opposed to specifying a particular crime of violence. So what's wrong with that? Well, traditionally, in my practice and in my experience, when the phrase to wit is used, it specifies, it applies to the phrase that follows it. For instance, in count two of this indictment, which was the attempted Hobbs Act robbery, it reads that they unlawfully agreed to take and obtain property, including U.S. currency, from owners and employees of China Wok, to wit, and then in common parlance, to wit means namely, or that is to say, so... But the 924C by itself is a crime of violence. I'm not sure that that's the question here because Hobbs Act robbery is a crime of violence. And that's what they conspired to do, to effectuate a Hobbs Act robbery. And that would seem to map on to the elements of 924O. I understand what you're saying, Your Honor. Our point here is that the actual indictment, the wording of the indictment, alleged that the crime of violence was to wit a violation of 924C, which we allege did not make any sense, but that's what the government chose to allege. And under U.S. v. Randall, which is cited in our briefs, although the government's not required to allege a crime of violence in the account, if they choose to do so, they must prove that crime of violence. Right. And they chose not to do so. They chose instead to use the broader language, which allowed the government then to plead and prove any crime of violence. I had to show their cards, but they didn't have to show their cards in the indictment. Well, by pleading it the way they did, in my view, they committed themselves that that was the crime of violence. Then later in the trial, after the close of evidence, we objected to the trial court instructing the jury that the crime of violence was a Hobbs Act robbery when that was not charged in the indictment. It's our position that that's a constructive amendment of the notice. I mean, obviously we knew what the evidence was. It's a matter of the grand jury right under the Fifth Amendment to only be tried on charges that are in the indictment. So, just so I'm clear, you don't disagree that the government could have chosen not to plead a specific crime of violence. They could have done, as I think they tried to do here, and you say failed. So what should the indictment, how should the indictment have read? Well, it should have either read, to wit, Hobbs Act robbery, the same robbery referred to in the other counts, or I have to say, based on the case law, they're not required to allege one at all, in which case they could do what you're suggesting, which is choose their crime of violence later. But when they choose to allege one, as they did, it's our position that... But you say that they didn't. They allege nothing. Well, what the indictment alleges is that the crime of violence was 924C, which is null and void, because it can't be. That's why we moved to dismiss for failure to stand an offense before trial. That was denied, and that's connected to what we did at the close of evidence, which was to move to dismiss for it being a constructive amendment of the indictment. It seemed to me we know what the elements of 924O are, and the first element is a to the conspiracy. Cell phone records and GPS records and forensic evidence, eyewitness testimony, business records, by his own admission, he was the driver of the Lincoln, which was the vehicle through whom the robbery was attempted. So there's a load of evidence that he's linked to the conspiracy. All right, that was the second element of the 924O, which was, did he knowingly use or possess a firearm? Well, he made the call for the co-conspirators to initiate the robbery, and he said, headlights coming, get on point, and a co-conspirator actually testified at trial that Mr. Wiley fired his firearm. He was there during the attempted robbery. So you have a conspiracy to knowingly use or possess a firearm. And then the third element is whether that was in furtherance of a crime of violence. And it's well established that Hobbs Act robbery is a crime of violence. And so when I look at the elements of 924O, and then I go back into the record of the trial, there's all kinds of evidence as to the conspiracy and Wiley, Mr. Wiley's involvement. The conspiracy, absolutely, had in one of its purpose the use of possession of a firearm, which Mr. Wiley fired. And then the crime of violence here was the Hobbs Act robbery. So I don't really understand, given the elements of 924O, and given the evidence which supports each of those elements, I don't understand why count three didn't state an offense. And that seems to me very straightforward. I may be missing something. But it's a hard case in some ways, because what happened here, you have to step back sometimes, what happened here was perfectly terrible. Perfectly terrible, and you and I would agree on that. These people are doing nothing more than to try to operate a family business and make a go of it. And suddenly they come home one night, find their vehicle fired on. And Miss Chen really was perfectly heroic. Her husband was being shot, fired on. She returned fire, saved her own life, and who knows who else's. But she's perfectly heroic, and the crime is perfectly horrific. And it seems to me that this is exactly the kind of case that 924O was meant for. Your Honor, we're not disputing the evidence. We're disputing that the pleadings were sufficiently appropriate to allege the Hobbs Act crime of violence when it wasn't in the indictment, and therefore is our client's grand jury indictment to only be tried on what's alleged. The government doesn't have to say what the crime of violence is. What it has to do is put on the evidence that would prove it. And my gosh, if this evidence didn't suffice to prove a Hobbs Act robbery or attempted Hobbs Act robbery, I don't know what will. The evidence is overwhelming. Thank you, Your Honor. I see that my time is up. Okay, we've got some time for Mr. Foster. Mr. Bryson, we'll hear from you. May it please the court, I'm going to address the Batson challenge. The underlying facts are set forth in beginning of page 21 on our principal brief. In short, on the very first panel that was tendered to the government, the government excused two out of three black jurors that were presented to them. We raised the Batson challenge at that point. The trial court assumed a prima facie case and asked the government to state their reasons. The government indicated that each of the two jurors, when asked the exact same question that they had answered in written form on their questionnaire, either didn't disclose fully everything that was written on their questionnaire or didn't respond at all. And we argued that that was pretextual. The court ruled against us and here we are. One of our arguments is specifically that the act of acting the exact same question again, rather than actually asking a true follow-up question to the content that is on the questionnaire, is in itself effectively a trick or a trap question, similar to that outlined in the United States Supreme Court decision in Miller L. But the government, in their position, they didn't have any idea the race of the jurors on the question until they came into the actual room. Correct. And so how would that be pretextual of them asking the court? I think what they asked for was, is there any one in your family that, the more specific question is regarding criminal, has been charged or arrested of any criminal violations? Right. And toward the end of Wadeer, after everybody had been in the panel and everybody had seen everybody, as a follow-up question, the government went up to the bench and asked the judge to essentially re-ask this question number four again. So they would have known what the race of the jurors were. But they asked that the question be asked of all three jurors, right? They was asked of the panel as a whole. Okay. So, I mean, it wasn't like they were singled out. They were singled out, right? No, but not everybody had answered that question. In fact, very few people had actually answered that question on their questionnaire. Wasn't the difference here that the white juror who was not excused had actually responded affirmatively and reaffirmed his answers to this question, albeit in a different time during the proceeding. And that was a legitimate distinction for the government to make. He did talk about it earlier when the judge was questioning about something else. But all three jurors who had answered that question number four, when specifically asked that question, as the follow-up at the end, nobody responded. No, I think that's right. But I guess the government's point is that they already knew the answer from the white juror because he had actually responded. Whereas the other two African-American jurors did not. And our response would be that the other two African-American jurors had answered the question on their questionnaire in the first place. In response to our argument about this being a trap or a trick question, the government says this on page 54 of its brief about what happened at court. The district court asked Wiley to offer argument that the government stated reasons were pretextual or to produce evidence of intentional prejudice. No evidence was put forward. Instead, counsel for Wiley merely restated his argument that a prima facie case had been established. Take serious issue with that. If you go to page 127 of the joint appendix where the government cites for that, you see that we make the specific argument, beginning at the bottom of page 126. And I would say if you wanted to do a follow-up question and you wanted to say, Ms. Ingram, tell us about your sister that you indicated on your form, that would be a very reasonable and rational follow-up question to do. Isn't the standard of review important here? But I think that it's not important. The Supreme Court has indicated, I think, that it's a clear error of standard. And in many instances, a trial judge doesn't have the act right before him. He's making a judgment on what a witness said about something outside the courtroom. But here, the basis of your claim all transpired within the courtroom. And frankly, district courts have a much better sense and view of that. This is a very fine district judge. And they have a much better sense of that than we do trying to reason from a cold record. And the Supreme Court has hammered that in that if there ever was a matter within the province of the trial court, it would be this. I mean, I'm just saying, I think in appellate judging, you always have to ask yourself, who has the better vantage point? And here, it would seem hands down that the district court did. I understand the standard of review, but I would argue in this case that the cold record shows things that were not obvious to the court while things were happening. I'm about out of time. All right, Mr. Green, we'll hear from you. May it please the Court, Graham Green for the United States. In this matter, the government, as it set out in its brief, does not believe the court made any error relative to jury selection or the ruling that the district court made on the indictment and ultimately the defense motion to dismiss, alleging that there was not sufficient evidence of two conspiracies. Here, there was ample evidence in the record that Mr. Wiley and others had conspired together to do a completed Hobbs Act robbery. That is, that they planned to rob the members of the China Walk. They did so because they specifically wanted to target the proceeds of that business, and that was discussed exclusively. The evidence relates that these individuals knew each other. They texted each other in the moments right before the beginning point of the conspiracy, before the first surveillance took place in the China Walk. Mr. Wiley secured a rental vehicle. They went to the China Walk, conducted surveillance. They returned again the next day, conducted additional surveillance at the business. As the record reflects, the business is very close to their home. They followed them from the business and set out to basically lay in wait until they returned. All of the evidence suggests that they believed that they were going to be recovering proceeds from the business, that that was their express intent, and that, as noted by the district court in denying their motion to dismiss, there were conversations in the car immediately before they got out that, there's a get-on-point, there's the money bag, and to give it up, meaning the money. These also are sufficient evidence of two separate conspiracies, obviously. Can you put that microphone a little closer to you? Yes, sir. Thank you. Thank you. There were two separate conspiracies. That is, that there was an additional conspiracy to possess firearms to facilitate that. As the district court noted in its opinion denying the money, the individuals discussed having firearms, that they needed firearms, that they were going to use the firearms to commit the robbery. Also, before they left, one of the co-conspirators, in particular Mr. Wiley, gave a firearm to a co-conspirator because he didn't have one. They then committed the robbery and then used those firearms, as the evidence shows, were multiple shell casings and basically a terrible shootout. I was a little, well, not taken aback, but it just seems a little odd to me that the government could plead two separate conspiracies in a case like this, and that doesn't take away from the horrific nature of this crime. It just seems strange that the government is allowed to sort of chop this up into discrete acts and say, well, they agreed first to possess firearms, and then they went out and committed the robbery. Maybe the point is that you don't need a weapon to commit a Hobbs Act robbery, and if you do that, then you're liable to be charged twice. But this seems to me to be one offense. I think the court has said on it that you don't need a weapon to commit a Hobbs Act robbery, or you could choose any weapon. You could choose a gun. In this case, Congress, in passing, the 924-0 offense obviously sought to criminalize the conspiracy to possess a firearm that's going to be used in context of a crime of violence. So it appears that Congress considered that, obviously, the Hobbs Act... I looked into that question myself when the chief judge raised it, and it seemed to me that our precedent was pretty much on point, because in the Hare case, there was a Hobbs Act conspiracy and a 924-0 conspiracy, and our court held that was okay. So you have a precedent that a separate conspiracy is, as you've mentioned, the fact that the Hobbs Act robbery doesn't need to involve a firearm, whereas the 924-0 conspiracy, the use of a firearm is necessary. So the conspiracies have different elements, and you leave it up to the jurors to decide whether the elements have been met by the evidence. But I thought in reading the Hare case that it was right on point because of the difference between the two conspiracies, one involving a firearm and the other not necessarily. And I think that's right, Judge Wilkinson. And Judge DeAnne, to your point, again, we do have a range of time in which we have various things happening over this time. And the question is, heretofore, as the court has announced, who generally kind of makes these rulings on findings of fact in terms of whether there was one or multiple conspiracies? This court has routinely deferred to jurors making those findings of fact. And in this case, there was substantial evidence in which rational jurors could find that at a point in time that agreement was sufficiently firm and sufficiently proven by the government specifically that they had guns, that one was provided to a co-conspirator on the very night in which those would be used to commit the attempted Hobbs Act. Are there any other questions from the court? Are you moving on to the Batson issue? I can, certainly. Well, I have a question about that. So is there any reason, I mean, when those jurors fell silent in response to the question about whether or not someone, either they or their relatives, I forget the precise nature of the question, were involved in a civil or criminal proceeding, should we attach any significance to the fact that the prosecution, rather than asking follow-up questions, decided to remain silent? I mean, one could argue that, having been satisfied that they could make a distinction based on the fact that the two African-American jurors said nothing and the white juror, at least at some point in the proceeding, had responded affirmatively to that question, the prosecutor could then stand up and say, here's the reason they stood silent. But on the other hand, why wouldn't the government ask a follow-up question and say, I noticed that you didn't respond when the judge asked that same question that you responded to in the questionnaire. Can you explain why? Certainly. I think there's an interaction between, and the record is pretty clear, I think it was Judge, I'm sorry, Juror Riddle. She had checked a box that she would be too embarrassed in open court to answer that question. Judge Ingram, you will see an interaction between the court and the government where the government indicates, I think, that Juror Riddle also had maybe indicated that she was too embarrassed to answer that question, although that ultimately was not correct. She had checked that it was fine for her to disclose that in court. Of course, as this court knows from its long experience trying cases, the government kind of walks a line, any litigate walks a line between trying to elicit information from a juror and trying to embarrass or potentially alienate them. So we did ask follow-up questions because that was the information we wanted. We wanted to know, and it's clear from the very beginning, before any of the jurors came down, before any of the race of the jurors were known, we indicated to the court that those three jurors had indicated something about their form and we would want to know more information about it. The court, if you're asking, could the government have also said, well, as to these two jurors, Judge, we'd like you to specifically kind of challenge them on the issue that they've not disclosed something on court that could have happened. But I want to use an example as what's been presented as this question of trickery, that is that this is the government is trying to trick these jurors. I'll use juror number 11, Mr. Sanders, as an example. As presented by the appellate in his brief, he says that juror number Sanders self-identified as mixed and that the government didn't ask this follow-up question, which seems to be at issue. In fact, at the end of the jury selection, Judge Schroeder went through each of the jurors that appeared to be African-American and asked the parties if they agreed. And juror number 11, Mr. Sanders, was asked, was identified as one of those jurors who appeared to be an African-American, and the parties agreed that was correct. If we look at the way Mr. Sanders answered the question, the way the government dealt with Mr. Sanders, during the course of the colloquy, Mr. Sanders disclosed that when he was 19 years old, he had been involved in a robbery in South Carolina and that he ultimately had done about eight months in jail and pled guilty to a misdemeanor. And if we look at the record, Mr. Sanders did not circle yes on his form. He did not disclose that on his form. And so if the theory from the appellant is that the government is setting traps, that is, to try and get some sort of inconsistent answering from what's on the form versus what comes out in court or doesn't come out in court, then you would have expected to find the government strike Mr. Sanders and say, well, Judge, he didn't check yes on the form, but he just told us that he, in fact, had been convicted of criminal offenses. But that's not what happened. The government did not strike Mr. Sanders, and he was selected as a juror. There were a number of other African-American jurors, right? That's correct. And so there is just no... The theory, I guess, that the government is using this form and the answers or non-answers to these questions is trickery, falls on its face. And I correctly points out, ultimately, when first presented with the issue, Judge Schroeder, the district court judge, my apologies, conducts a fairly in-depth analysis. He stops the proceedings. He goes back and he looks at the transcript. He looks at what's happened. He applies the appropriate law to the analysis. The appellant at that point admits that this is a race-neutral reason for the exclusion. And ultimately, the judge makes a credibility finding that the government is telling the truth about its reasoning. And your point is well made. Could it have been done differently? Could... There might have been some follow-up questioning. I think that's always the case. But in this case, it certainly was not race-based. It was... In fact, is there anything that would... The reason that no follow-up question was asked, that this was racially motivated in any way. In this trial, the government put on a lot of documentary evidence. And I gather some of the co-conspirators testified as well. And Ms. Chen, she testified? She did. Yes, Your Honor. You know, I always try to look at the human element of this. That must have been a very hard experience for her to go through the events of that evening and then to go through it all again. And we're going to... The counsel is urging now that we expose all that to her for a third time. Now, it's crucial above all that there be a fair trial. But it's important also that we don't... That we recognize the advantage of an initial trial over a retrial. And I don't think it's remiss to think of what Ms. Chen has gone through and not wanting to drag her through it yet one more time. I can't imagine what it was like. I just can't imagine it. Her husband killed, family members assaulted, being in a shootout. I thought there was an arrow of law here. I wouldn't hesitate to reverse but this trial judge, he's a good trial judge and he ran a doggone good trial. He ran a good trial. And it's not the kind of situation where you want to reverse on a casual basis because these are traumatic events and the trial was fair and the trial was good. And that's all I have to say that these different counts that were charged, they were all put before the jury on the elements and the jury found that the elements were met. So I think you leave this case deeply saddened by what happened, but also with a sense of comfort that even given the heinousness of the trial that the system bent over backwards to provide a fair trial. And in fact, it did just that. In closing, I would say the government does not advance its arguments with the complaint that this court does not have clear oversight over everything that took place and every decision that was made. But given the standards that we have before and this court has announced previously in each of these questions presented before the court, the court has typically deferred to the findings of the district court judge as it relates to jury selection procedures. The court has generally deferred to the juries in terms of sufficiency of the evidence. And we'd ask the court to keep that in mind as it looks at this rather substantial record. I'll certainly answer any other question. I think I do have one question on the constructive amendment. I'm just curious. The judge, the lower court gives the jury charge. Whose suggestion is that? The government's suggestion to add the Hobbs Act robbery as a predicate offense or does the judge do that The, I believe what happened here, Judge Benjamin, is we proposed joint jury instructions. I would have to check, but I believe that was part of the proposed joint instructions that the judge actually instruct the jury that a Hobbs Act robbery is a crime of violence. And ultimately, that is what the court did instruct. Okay. Thank you. Thank you, Mr. Green. Yes, Your Honor. Thank you. Mr. Foster. Thank you, Your Honor. And Judge Benjamin, just briefly on that point, at the close of evidence, the Rule 29 motion, we objected to the Hobbs Act robbery being before the jury based on the same arguments we made about the fact that it wasn't charged in the indictment. I'd like to deal with the single versus multiple conspiracy issue that was discussed a moment ago. The most compelling evidence before the court at trial, there was only one co-conspirator who testified, Hakeem Cox. On page 1114 of the joint appendix, the prosecutor asked him, why did you have guns? Answer, because we was going to commit a robbery. Question, was the agreement between you, answer, yes sir. Question, to have guns to commit a robbery. He was asked again by the prosecutor, page 1119 of the joint appendix, why was it necessary to make sure he was armed? Answer, because everybody needs a gun. Question, why do you need a gun? Because we was fixing to go rob somebody. So it was clear in the only co-conspirator who testified that the agreement here was to commit an armed robbery. Part and it was not a separate agreement. And I would like to briefly address the effect of the hair, United States versus hair holding that was mentioned earlier. My position is that case does not stand for the proposition that you can jointly be convicted and separately punished of a conspiracy under 924-0 and a Hobbs Act conspiracy. That case held three, there were three issues before that court. And these are the holdings. One, the defendant was not entitled to additional discovery on a claim of selective enforcement. Two, the government did not engage in outrageous conduct and thus violate due process in connection with a sting operation by the ATF. Three, that any erroneous instructions in aiding and abetting possession of firearms and furtherance of drug trafficking crimes was not plain error. That court did not address the issue that we had a Hobbs Act robbery and a conspiracy to possess firearms and furtherance of that same Hobbs Act robbery can be separately prosecuted and if found guilty, separately punished. Can I ask, so what then is the effect of 924-0? Is it a dead letter under your reading? No, Your Honor. I mean, in this case, had the jury reached separate verdicts, obviously you could be sentenced on that one or if they charged one but not the other. It's not a dead letter. It's just that when you're alleging that the crime of violence to be committed is the same conspiracy goal in a separate charge and they're together, count one had nothing, no element in it that count three did not have. Count three was using firearms and furtherance of the same exact Hobbs Act robbery. So our position is it was one conspiracy and punished separately. How does this differ from our Heer decision? Well, Your Honor, I don't think the Heer decision dealt with this issue of the overlapping conspiracies and whether you can be convicted and punished separately. That dealt with... The same two conspiracies were alleged there as here. Well, but from my reading of that opinion, Your Honor, the defendant... No, my position is the defendant in that case did not raise the issue that we're talking about here and the court issued three holdings, none of which apply to the issue that we're discussing today. And Heer didn't accord because it says drug trafficking and furtherance of drug trafficking or crime of violence. And my reading of Heer was that they didn't even... Because that was the... They had in furtherance of drug trafficking that the crime of violence was an address. Is that correct? That's my understanding, yes. Okay. And my time is up. Thank you, Mr. Foster. Mr. Bryson. I just wanted to address two things that Mr. Green said. One, he talked about Juror Saunders and whether he was mixed race or African-American. And apparently, later on, the court did determine and apparently we agreed that he was African-American. I did want to point out that on page 1560 of the joint appendix, there is the chart that shows that he self-identified as mixed. The other thing I wanted to address is the court's question about whether or not the government could have asked a true follow-up question rather than just re-asking question four again. And Heer, the government is saying, well, yes, maybe things could have been done differently. At trial, the government contended that they had been deprived of an opportunity to ask those follow-up questions based on juror Riddles and jurors Ingram's responses to the court. And that's at page 114 of the joint appendix. And I'm out of time. Thank you. Thank you, Mr. Bryson. Mr. Foster and Mr. Bryson, I note on my docket sheet that both of you are court-appointed. I want to thank you on behalf of the court for your excellent advocacy here this morning. On behalf of Mr. Wiley, we obviously could not engage in the important work that all of us do without lawyers who are willing to take these cases and come before us and, as you did, effectively and honorably represent your clients. So thank you for that. We're going to move on to our second case. But before we do that, Judge Benjamin and I are going to come down and greet counsel. Judge Wilkinson, for health issues, is going to stay behind. It's not that he doesn't like you. He just is being cautious, I think, appropriately so. So we'll come down. No less appreciated. Thank you very much.
judges: Albert Diaz, J. Harvie Wilkinson III, DeAndrea Gist Benjamin